IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| ANTOWON HOLLOMAN | : | CIVIL ACTION |
| | : | |
| v. | : | No. 13-3804 |
| | : | |
| CAROLYN W. COLVIN, | : | |
| Acting Commissioner of Social Security | : | |

**MEMORANDUM**

**Juan R. Sánchez, J.**                                                                                                **October 9, 2014**

      Plaintiff Antowon Holloman seeks review of the denial of his application for Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI) by the Commissioner of Social Security. On April 28, 2014, United States Magistrate Judge Linda K. Caracappa issued a Report and Recommendation (Report) recommending Holloman's request for review be denied. Holloman filed objections to the Report, asserting the Magistrate Judge erred in evaluating his arguments that the Administrative Law Judge (ALJ) failed to properly develop the record by ordering IQ testing, wrongly rejected his treating physician's opinion, and improperly assessed his Global Assessment of Functioning (GAF) scores and responsiveness to medication. Upon de novo review of Holloman's objections, the Court agrees with the Magistrate Judge that the ALJ did not err in evaluating Holloman's GAF scores and response to medication. The Court, however, will sustain Holloman's objection regarding the ALJ's reliance on a nontreating specialist opinion over that of his treating physician and will sustain in part his objection concerning the ALJ's decision to not order IQ testing. Therefore, Holloman's request for review will be granted in part, and this case will be remanded to the Commissioner for further review consistent with this Memorandum.

**BACKGROUND**

Holloman applied for DIB and SSI on September 13, 2010, and September 23, 2010, respectively, claiming he had been disabled since June 15, 2007, as a result of depression and hypertension. After his applications were initially denied, a hearing was held before an ALJ at Holloman's request on February 23, 2012. At the hearing, Holloman amended the alleged date of disability onset to May 1, 2009. In a decision issued on April 5, 2012, an ALJ, applying the Social Security Administration's five-step sequential evaluation process for determining whether an individual is disabled,[1] concluded Holloman was not disabled at any time during the relevant period. Although the ALJ found at step two of the analysis that Holloman suffers from severe impairments (affective and anxiety disorders) which significantly limit his ability to perform basic work activities, she concluded at step three that these impairments do not meet or medically equal any of the listed impairments. *See* A.R. 14-15. Upon consideration of the record and hearing testimony, including testimony from both Holloman and a vocational expert, the ALJ found Holloman retains the residual functional capacity to perform a full range of work at all exertional levels but is limited to unskilled work with routine and repetitive tasks, no frequent changes in the work setting, and only occasional interaction with the public, coworkers, and

---

[1] The Commissioner uses the same five-step process to determine whether an individual is disabled in both SSI and DIB cases. *See* 20 C.F.R. §§ 404.1520 (DIB), 416.920 (SSI). The Commissioner must first determine whether the claimant is currently engaging in substantial gainful activity. If so, the claimant is not disabled. Second, the Commissioner must determine whether the claimant has a severe, medically determinable physical or mental impairment. If the answer to this question is "no," the claimant is not disabled. At the third step, the Commissioner must determine whether the claimant's severe impairment meets or is medically equivalent to an impairment listed in Appendix I to Subpart P of 20 C.F.R. Part 404. If so, the claimant is disabled. If not, the Commissioner must assess the claimant's residual functional capacity to determine, at the fourth step, whether the claimant can perform her past relevant work. If so, the claimant is not disabled. If not, the claimant will be found to be disabled unless the Commissioner demonstrates, at the fifth step, that the claimant is capable of performing other available work. *See Fargnoli v. Massanari*, 247 F.3d 34, 39 (3d Cir. 2001) (describing the five-step sequential evaluation process).

supervisors. A.R. 16. Based on this residual functional capacity analysis, the ALJ determined Holloman is capable of performing past relevant work as a store laborer or fast food worker and is therefore not disabled. A.R. 18. The Appeals Council denied Holloman's request for review, and Holloman thereafter filed the instant action seeking review of the Commissioner's decision.

In his request for review, Holloman argues the ALJ's decision is not supported by substantial evidence because the ALJ (1) erred in disregarding Holloman's treating physician's opinion and instead adopting a nontreating physician's opinion; (2) failed to properly develop the record by refusing to submit Holloman for IQ testing; (3) erroneously accorded outcome determinative weight to his GAF scores; and (4) erred in concluding Holloman's response to medication refuted a finding of disability. On April 28, 2014, Judge Caracappa issued a Report addressing each of these alleged errors, concluding the ALJ's decision was supported by substantial evidence, and recommending the Court affirm the Commissioner's denial of benefits. In his objections to the Report, Holloman takes issue with Judge Caracappa's resolution of all the issues raised in his initial request for review.

**DISCUSSION**

Under 28 U.S.C. § 636(b)(1), this Court reviews de novo "those portions of the report or specified proposed findings or recommendations to which objection is made." Review of a final decision of the Commissioner of Social Security, however, is limited to determining whether the decision is supported by substantial evidence. *See* 42 U.S.C. § 405(g); *Pierce v. Underwood*, 487 U.S. 552, 564-65 (1988); *Hartranft v. Apfel*, 181 F.3d 358, 360 (3d Cir. 1999). Substantial evidence requires "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Reefer v. Barnhart*, 326 F.3d 376, 379 (3d Cir. 2003) (citations omitted). The substantial evidence standard is satisfied "if there is

sufficient evidence 'to justify, if the trial were to a jury, a refusal to direct a verdict.'" *Id.* (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 477 (1951)). If the ALJ's decision is supported by substantial evidence, the district court is bound by the ALJ's findings, even if it "would have decided the factual inquiry differently." *Fargnoli v. Massanari*, 247 F.3d 34, 38 (3d Cir. 2001).

### A. Treating Physician Reports

Holloman argues the ALJ's decision is not supported by substantial evidence because the ALJ erred in evaluating his treating physician's report. The Court agrees the ALJ improperly ignored the medical notes and opinions of Holloman's treating specialists and gave too much weight to a consultative examiner who met with Holloman only once.

The ALJ must consider all relevant evidence from "acceptable medical sources" when evaluating a claimant's impairment. *See* 20 C.F.R. § 416.913(a).[2] Acceptable medical sources include, inter alia, licensed physicians and licensed or certified psychologists. *Id.* Treating physicians' reports are to be given great weight, especially "when their opinions reflect expert judgment based on a continuing observation of the patient's condition over a prolonged period of time." *Morales v. Apfel*, 225 F.3d 310, 317 (3d Cir. 2000) (quoting *Plummer v. Apfel*, 186 F.3d 422, 429 (3d Cir. 1999)). The ALJ "must consider the medical findings that support a treating physician's opinion that the claimant is disabled," and "may reject a treating physician's opinion outright only on the basis of contradictory medical evidence." *Id.* (quoting *Plummer*, 186 F.3d at 429). If there is contradictory medical evidence in the record, including an opinion provided by a non-treating, non-examining physician, the ALJ may accept the most credible medical opinion. *Plummer*, 186 F.3d at 429. In addition, the ALJ "may afford a treating physician's opinion more

---

[2] The regulations for SSI mirror those for DIB. For ease of reference, the Court will cite only the SSI.

4

or less weight depending upon the extent to which supporting explanations are provided." *Id.* However, in rejecting a treating physician's assessment, the ALJ may not make "speculative inferences from medical reports" or rely on his "own credibility judgments, speculation or lay opinion." *Jones v. Sullivan*, 954 F.2d 125, 129 (3d Cir. 1991) (quoting *Plummer*, 186 F.3d at 429). The ALJ must also make clear her reasons for giving a treating physician's opinion less than controlling weight or rejecting it altogether. *See Horst v. Comm'r of Soc. Sec.*, 551 F. App'x 41, 45 (3d Cir. 2014) ("[A]n explanation from the ALJ of the reason why probative evidence has been rejected is required so that a reviewing court can determine whether the reasons for rejection were improper." (quoting *Cotter v. Harris*, 642 F.2d 700, 706-07 (3d Cir. 1981)) (internal quotation marks omitted)). The ALJ may not "reject evidence for no reason or for the wrong reason." *Rutherford v. Barnhart*, 399 F.3d 546, 554 (3d Cir. 2005) (citations omitted).[3]

Holloman began receiving treatment for post-traumatic stress disorder and major depressive disorder at the Safe Meadow Health Center in July 2010. The Record indicates that while he was a patient at Safe Meadow, Holloman was treated on a consistent basis by at least two specialists—his psychiatrist, Dr. Clarence Verdell, M.D., and his therapist, Basiru Kanaji, MHS. Dr. Verdell completed a portion of Holloman's initial biopsychosocial evaluation in August 2010.[4] A.R. 242-56. Thereafter, Holloman met with Dr. Verdell about once a month for

---

[3] Although a therapist who is not a licensed or certified psychologist is not considered to be an "acceptable medical source" under the Social Security regulations, an ALJ may nevertheless consider a therapist's opinions in evaluating a claimant's disability. *See Yensick v. Barnhart*, 245 F. App'x 176, 181 (3d Cir. 2007) (citing 20 C.F.R. § 416.913(d)(1)); *see also* 20 C.F.R. § 404.1513(d)(1). A treating therapist's opinion, however, is not given controlling weight. *Yensick*, 245 F. App'x at 181.

[4] The biopsychosocial evaluation is dated July 27, 2010 and is made up of two sections—Part A and Part B. In August 2010, Dr. Verdell signed Part B of the evaluation, which includes a psychiatric history, mental status examination, biopsychosocial formulation, initial DSM-IV TR diagnosis, proposed treatment, and provisional recommendations.

roughly fifteen minutes each time. Dr. Verdell recorded his observations for each session on a standard form, very briefly noting Holloman's medications and reactions. *See, e.g.*, A.R. 323, 325, 327, 328, 334, 335, 337, 339, 340, 381, 383, 385, 391, 395. Holloman began meeting with Mr. Kanaji on a monthly basis in December 2010; his sessions with Mr. Kanaji lasted about an hour. Mr. Kanaji recorded his notes on a Safe Meadow form titled "Clinical Progress Note" and provided much more detail than Dr. Verdell on his meetings with Holloman. *See, e.g.*, A.R. 329, 330, 332, 333, 336, 338, 378, 380, 382, 384, 388, 389, 392, 393, 396. Holloman's last session with Mr. Kanaji that appears in the Record took place on February 2, 2012. A.R. 396.

On December 20, 2010, Dr. Charles Johnson, a consultative examiner, completed a Clinical Psychological Disability Evaluation based on an in-person interview with Holloman. A.R. 271-77. As part of this evaluation, Dr. Johnson filled out a check-the-box form, marking that Holloman had at most "slight" limitations in his ability to understand, remember, and carry out instructions, and his ability to respond appropriately to supervision, coworkers, and work pressures in a work setting. A.R. 275-76. In the observation section, Dr. Johnson stated Holloman's social judgment and abstraction of relevant concepts were marginal and his impulse control and insight were fair. A.R. 273. Dr. Johnson also stated Holloman was oriented to time, place, and person, his memory for recent events was intact, and his thought processes were logical and coherent. *Id.* Dr. Johnson noted Holloman's attention span and concentration were poor, but added, "intentional inefficiency was suspected." *Id.*

On December 31, 2010, Dr. Sandra Banks completed a Mental Residual Functional Capacity Assessment for Holloman based on a review of Holloman's records. Dr. Banks did not meet with Holloman in person. Using another check-the-box form, Dr. Banks marked that Holloman was "not significantly limited" in all but four mental activities in which she marked

him as "moderately limited." A.R. 278-94. The four areas of moderate limitation were in Holloman's ability to (1) carry out detailed instructions, (2) maintain attention and concentration for extended periods, (3) complete a normal workday and workweek without interruptions from psychologically based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods, and (4) respond appropriately to changes in the work setting. A.R. 278-79. Dr. Banks concluded that Holloman was "able to meet the basic mental demands of competitive work on a sustained basis despite the limitations resulting from his impairments." A.R. 280. She concluded he had adjustment disorder with depressed mood, major depressive disorder, bereavement, and post-traumatic stress disorder. A.R. 284, 286.

In contrast to the findings by Dr. Johnson and Dr. Banks, Dr. Verdell, Holloman's treating physician, completed a Medical Source Statement on June 30, 2011, in which he noted that Holloman was markedly limited in twelve categories of mental ability and moderately limited in the remaining eight. A.R. 346-49. Dr. Verdell also indicated Holloman had substantial loss of ability to (1) make judgments that are commensurate with the functions of unskilled work, (2) respond appropriately to supervision, coworkers, and usual work situations, and (3) deal with changes in a routine work setting. A.R. 349. Also on June 30, 2011, Mr. Kanaji and Dr. Verdell answered a series of interrogatories, stating that Holloman was extremely depressed, anxious, and paranoid. A.R. 343-44.

In evaluating the medical opinion evidence, the ALJ first pointed out that Dr. Banks's opinion conflicted with the opinion rendered by Dr. Johnson regarding the nature and severity of Holloman's condition, and indicated she would consider Dr. Johnson's opinion to be more

reliable because he completed an in-person interview. A.R. 17.[5] The ALJ found Dr. Johnson's opinion was well supported by treatment notes in the medical evidence and was not inconsistent with the other evidence, and she therefore accorded the opinion "significant weight" and used it as the basis for her findings regarding Holloman's residual functional capacity. *Id.* The ALJ acknowledged Dr. Verdell's opinions in the Medical Source Statement that Holloman was "extremely depressed, anxious, and paranoid" and was markedly limited in nearly all work activities, including his ability to understand and remember very short and simple instructions. A.R. 343, 346-49. The ALJ gave Dr. Verdell's opinions "very little weight," however, because they contrasted "sharply" with both the progress notes, which, according to the ALJ, found Holloman to have mild symptoms, and his assigned GAF scores in the range of 65 to 75. A.R. 17. The ALJ also stated that although Holloman was receiving consistent, routine treatment for his symptoms, his progress notes demonstrated that he was responding well to the medication and was less depressed and more motivated. *Id.*

The Court finds the ALJ's reasons for not according Dr. Verdell's opinion significant weight are not sufficient. First, Holloman was never assigned a GAF score of 75. The highest GAF score Holloman received during his treatment was 65, and both treating specialists noted that in the year prior to intake at Safe Meadow, his highest GAF score was 70. A.R. 318, 341, 386. Furthermore, Holloman's GAF score did not change during his treatment at Safe Meadow; when he first entered Safe Meadow in July 2010, his GAF score was recorded as 65, and on October 13, 2011, his GAF score was again recorded as 65. *Compare* A.R. 318, *with* A.R. 386.

---

[5] Confusingly, immediately after stating Dr. Johnson's opinion would be regarded as more reliable than Dr. Banks's opinion, the ALJ stated Dr. Banks's opinion "is also consistent with the residual functional capacity to perform a range of unskilled work." A.R. 17. Thus, it is unclear to the Court how much, if any, weight the ALJ gave to Dr. Banks's opinion.

Second, the ALJ relied too heavily on a single note by Dr. Verdell. While it is true that in one note dated September 2010, Dr. Verdell characterized Holloman as "less depressed and more motivated," A.R. 325, it is not fair to state, as the ALJ did, that "[s]ubsequent progress notes showed similar improvements," A.R. 17. The majority of Dr. Verdell's notes simply state Holloman's medications were effective and he was not reporting any side effects. But the mere fact that a claimant responds well to medication does not mean he is capable of substantial gainful activity. *See Morales*, 225 F.3d at 319 (noting the treating doctor's "observations that [the claimant] is 'stable and well controlled with medication' during treatment [do] not support the medical conclusion that [the claimant] can return to work"). In fact, the only reason for Dr. Verdell to continue to prescribe Holloman medications was because, according to Dr. Verdell's monthly notes, Holloman was still suffering from anxiety and depression. In addition, the ALJ did not once reference Mr. Kanaji's notes, which provide many details about the struggles Holloman faced and serve as substantial support for Dr. Verdell's conclusions in his Medical Source Statement. From December 2010 to February 2012, Mr. Kanaji noted that Holloman regularly heard voices and sounds, felt paranoid, had suicidal thoughts, and saw images of dead family members. Holloman also consistently needed a three-drug regimen of psychotropic mediations and therapeutic support, as well as constant family supervision. On February 2, 2012, about three weeks before his hearing in front of the ALJ, Holloman reported to Mr. Kanaji that he was not only still hearing voices and feeling paranoid and anxious, but also had suicidal thoughts about twice in a twenty-four hour period. A.R. 396.

Moreover, Dr. Johnson's clinical findings from his interview with Holloman contradict his own conclusion about Holloman's restrictions. In the narrative portion of his evaluation, Dr. Johnson stated that Holloman spoke about his paranoia and depression, could not describe the

similarity between an orange and a banana or a person's eye and ear, could only recall three digits in a series, and was unable to complete basic multiplication. A.R. 273. Dr. Johnson's ultimate conclusions—that Holloman had no restrictions in carrying out instructions or understanding and remembering short simple instructions and only slight restrictions in carrying out detailed instructions—are not supported by his descriptions of his clinical interview with and mental state exam of Holloman. *Id.*

Thus, the ALJ did not properly justify her rejection of Dr. Verdell's evaluation, and the reasons she did provide are faulty. She also completely failed to discuss Mr. Kanaji's notes, which significantly support Dr. Verdell's findings. Dr. Verdell and Mr. Kanaji observed Holloman over a prolonged period of time, and both concluded that he had marked difficulties in social functioning. Although the ALJ found that Holloman was not fully credible, A.R. 18, this credibility determination is neither objective medical evidence nor an acceptable basis on its own for rejecting an examining physician's conclusion. *See Morales*, 225 F.3d at 318 ("Although an ALJ may consider his own observations of the claimant and this Court cannot second-guess the ALJ's credibility judgments, they alone do not carry the day and override the medical opinion of a treating physician that is supported by the record."). The ALJ relied upon the report of a physician who met with Holloman one time rather than the reports and records from providers who treated Holloman over an extended period of time. The Court will remand this case to the ALJ for further findings regarding whether Holloman's impairment meets or is medically equivalent to a listed impairment, in addition to further findings on Holloman's residual functional capacity and why the ALJ rejected and/or ignored the treating physician's and therapist's opinions and observations.

A. IQ Test

Holloman asserts the Magistrate Judge and ALJ incorrectly found he had not proved his impairments meet or equal a 12.05 Listing for intellectual disability, and the ALJ should have ordered an IQ test to see if he qualified. To meet Listing 12.05, the claimant must have "significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifesting during the developmental period, i.e., the evidence demonstrates or supports onset of the impairment before age 22," and must meet the criteria of one of the paragraphs A through D. 20 C.F.R. pt. 404, subpt. P, app. 1, § 12.05. Holloman argues he meets the criteria in paragraph C, which requires a "valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function." *Id.* § 12.05C. He insists that given the ALJ's finding at step two that he has a severe impairment, the only remaining issue is his IQ, which has never been tested. He claims the ALJ's conclusion that there was no evidence in the record suggesting a low IQ is not supported by substantial evidence, and asserts the Magistrate Judge incorrectly focused on whether the prescribed required IQ score was established prior to age 22 and not on whether the impairment and deficits first manifested themselves prior to age 22. Holloman points to school records from 1984 and 1986 indicating he received low scores on several standardized tests and was listed as "EMR," which stands for Educable Mentally Retarded. A.R. 295-305. Holloman also submitted an explanatory document which states the EMR designation refers to an IQ of between 50 and 70. A.R. 190.

To meet Listing 12.05C, Holloman must first show proof of a "deficit in adaptive functioning" with an initial onset prior to age 22 before demonstrating the specific requirements of paragraph C of the Listing; in other words, Holloman's ability to meet the Listing does not

11

turn solely on the results of his IQ test. The ALJ has the "duty to ensure that the evidence is sufficient to make the benefits determination." *Maniaci v. Apfel*, 27 F. Supp. 2d 554, 557 (E.D. Pa. 1998) (citations omitted). While an ALJ should obtain a medical opinion from an expert if the record fairly raises the question of equivalence to a listing, *id.*, an ALJ is not *required* to seek out medical expert testimony, *see Jakubowski v. Comm'r of Soc. Sec.*, 215 F. App'x 104, 107 (3d Cir. 2007) (citing 20 C.F.R. § 404.1527(e)(2)(iii)).

Here, the ALJ stated the record "fails to contain any evidence to suggest a low IQ or need for another consultative examination." A.R. 12. It is not clear to the Court if the ALJ determined Holloman met the first part of Listing (significantly subaverage general intellectual functioning). Although Holloman's school records from over twenty years ago may not fairly raise the question of equivalence to the 12.05C Listing, further review of the medical record in accordance with this Memorandum may permit a finding Holloman has "significantly subaverage general intellectual functioning with deficits in adaptive functioning" with an onset before the age of 22 and may suggest a low IQ or need for another exam. Because the ALJ's decision that the evidence does not "fairly raise the question" of equivalence to the 12.05 Listing may change after giving proper consideration to the reports and opinions of Holloman's treating physician and therapist, Holloman's objection will be sustained in part and the ALJ is directed to reevaluate her decision in accordance with this Memorandum.

**B. GAF Scores**

Holloman asserts that both the Magistrate Judge and the ALJ erred in giving outcome determinative weight to his GAF scores and in concluding his GAF scores refuted his treating physician's opinion he was impaired. In addition, Holloman points out his GAF scored decreased from 70 to 65 in the year before he began his treatment at Safe Meadow, and his score remained

at 65 even with the consistent treatment and medication he received, demonstrating that even if the GAF scores were given the appropriate weight, he did not improve with treatment.[6]

A GAF score is a "numerical summary of a clinician's judgment of [an] individual's overall level of functioning." *Rivera v. Astrue*, No. 12-6622, 2014 WL 1281136, at *7 (E.D. Pa. Mar. 27, 2014) (alterations in original) (quoting American Psychiatric Association: Diagnostic and Statistical Manual of Mental Disorders 32 (4th ed. 2000) (hereinafter DSM-IV-TR)). The GAF score ranges from zero to one hundred and assesses a person's psychological, social, and occupational function. *See Lozado v. Barnhart*, 331 F. Supp. 2d 325, 330 n.2 (E.D. Pa. 2004). A score in the range of 61-70 indicates "some mild symptoms (e.g. depressed mood and mild insomnia) OR some difficulty in social, occupational or school functioning (e.g. occasional truancy or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships." *Id.* (quoting DSM-IV-TR 32). GAF scores are considered to be acceptable and reliable medical evidence that informs the Commissioner's judgment of whether an individual is disabled and should be addressed by an ALJ in making a determination regarding a claimant's disability. *See Watson v. Astrue*, No. 08-1858, 2009 WL 678717, at *5-7 (E.D. Pa. Mar. 13, 2009) (citing cases).

While a claimant's GAF score is relevant evidence that should be addressed by the ALJ, the GAF scale, "does not have a direct correlation to the severity requirements in [the Social Security Administration's] mental disorders listings." Revised Medical Criteria for Evaluating Mental Disorders and Traumatic Brain Injury, 65 Fed. Reg. 50,746, 50,764-65 (August 21, 2000); *see also Gilroy v. Astrue*, 351 F. App'x 714, 715 (3d Cir. 2009). Thus, "[l]ike other evidence, a GAF score may be accorded little or no weight depending upon its consistency with

---

[6] As explained above, Holloman also correctly points out he never received a GAF score of 75, contrary to the ALJ's finding.

the other relevant evidence in the record." *Rivera v. Astrue*, No. 12-6622, 2014 WL 1281136, at *9 (E.D. Pa. Mar. 27, 2014) (citing *Torres v. Barnhart*, 139 F. App'x 411, 415-16 (3d Cir. 2005)).

As Holloman correctly states, the fifth edition of the Diagnostic and Statistical Manual of Mental Disorders, published in 2013, no longer includes GAF scores. In addition, the Social Security Administration released an internal guidance, AM-13066, effective July 22, 2013, which states ALJs may use GAF ratings as opinion evidence when assessing disability claims involving mental disorders, but such scores are "never dispositive of impairment severity" and ALJs should not "give controlling weight to a GAF from a treating source unless it is well supported and not inconsistent with other evidence." *Ladd v. Astrue*, No. 12-4553, 2014 WL 2011638, at *1 n.2 (E.D. Pa. May 16, 2014) (quoting AM-13066).

To the extent that AM-13066 changed the weight an ALJ may accord to GAF evidence, Holloman has provided no evidence that the 2013 policy applies retroactively to the ALJ's 2012 decision in this case. On the contrary, changes in the SSA regulations and corresponding policies typically apply "only in cases decided after the enactment of the changed regulation and/or policy." *Id.* (citing *Boone v. Barnhart*, 353 F.3d 203, 208 n.14 (3d Cir. 2003)).

Even if the new standard set forth in AM-13066 were applicable, Holloman's claim that the ALJ assigned outcome determinative weight to his GAF scores lack merit. In determining that Holloman was not disabled, the ALJ did not solely rely on Holloman's GAF scores, but also relied on Dr. Verdell's notes, Dr. Johnson's evaluation, and Holloman's hearing testimony. While the Court finds that the ALJ did not properly evaluate the notes and opinions of Holloman's treating physician and therapist, it is clear the ALJ did not inappropriately rely on Holloman's GAF scores, and his objection on this basis is overruled. On remand, however, the

ALJ should consider the fact Holloman's GAF score did not change during his extensive treatment at Safe Meadow.

### C. Response to Medication

Lastly, Holloman asserts the ALJ improperly relied on his response to medication as evidence of his ability to function in the workplace and that the alleged basis for his improvement was a cherry-picked note by Dr. Verdell that was not consistent with the treatment record as a whole. The Court agrees the ALJ improperly and selectively relied on one note by Dr. Verdell that Holloman was "less depressed and more motivated." A.R. 325. However, the Court does not find the ALJ based her conclusions on the fact Holloman was "stable" on medication.[7] As the Magistrate Judge explained, the ALJ relied on the treatment records which indicated Holloman's therapy and medication helped to control his symptoms. Although the ALJ improperly rejected the treating physician's and therapist's notes and perhaps accorded too much weight to Dr. Johnson's evaluation, her finding that Holloman was not disabled was not based solely on the fact Holloman was "stable" on medication; therefore, Holloman's objection on this basis is overruled.

**CONCLUSION**

For the reasons set forth above, the Court agrees with the Magistrate Judge that the ALJ did not improperly rely on Holloman's GAF scores or response to medication. Accordingly, the Court will overrule those objections, and as to those issues, the Report and Recommendation will be approved and adopted. The Court will sustain, however, Holloman's objection regarding the rejection of his treating physician's opinion and will sustain in part his objection regarding the

---

[7] As explained above, simply because a claimant responds well to medication does not mean he is capable of substantial gainful activity, *Apfel*, 225 F.3d at 319, and the ALJ should keep this consideration in mind on remand.

refusal to order an IQ test. The case will be remanded to the Commissioner for further review consistent with this Memorandum.

      An appropriate order follows.

                                  BY THE COURT:

                                    /s/ Juan R. Sánchez
                                 Juan R. Sánchez, J.